**U.S. BANKRUPTCY COURT**
**District of South Carolina**

Case Number:  **12-04348-dd**

## ORDER DENYING CONFIRMATION OF CHAPTER 13 PLAN

The relief set forth on the following pages, for a total of 13 pages including this page, is
hereby ORDERED.

---

**FILED BY THE COURT**
**11/14/2012**



David R. Duncan
US Bankruptcy Judge
District of South Carolina

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE: | C/A No. 12-4348-DD |
| Anthony Martellini, | Chapter 13 |
| | **ORDER DENYING CONFIRMATION** |
| Debtor. | |

This matter comes before the Court for confirmation of a Chapter 13 plan submitted by the debtor, Anthony Martellini ("Debtor"), on July 25, 2012. The Chapter 13 Trustee ("Trustee") objected to confirmation on July 30, 2012. The Court held a hearing regarding confirmation of the proposed plan on October 15, 2012. The Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. §§ 1334 and 157. After careful consideration, the Court issues the following findings of fact and conclusions of law with respect to Debtor's July 25, 2012 plan.

Debtor filed his Chapter 13 petition on July 15, 2012. His wife did not join in the petition with him. The filing was precipitated by a change in job status and income for Debtor. From 2007 through 2010, the United States Navy's Space and Naval Warfare Command employed Debtor in Orangeburg, South Carolina as a civilian within the information technology field. At the hearing, Debtor indicated that he knew his assignment in Orangeburg was temporary. According to Debtor's memorandum, his employer notified Debtor in late summer 2010 of the termination of his assignment in Orangeburg and relocated his position to Charleston, South Carolina. This change in his job assignment also meant a reduction in his salary, and Debtor began searching for other positions within the federal government. Shortly thereafter, he accepted a position with the Army Corps of Engineers in Charleston that had a slightly higher salary than the position to which he was being reassigned by Space and Naval Warfare

1

Command.  Debtor asserts this change in his job status resulted in the Martellinis' gross household income decreasing by $42,376.

Debtor indicates his estimated gross monthly income is $7,727 on his Schedule I.  Thus, Debtor's annual estimated gross income is $92,724.  His non-filing spouse's estimated gross income, as listed on Schedule I, is $7,067.  Consequently, Mr. and Mrs. Martellini's combined annual gross income is $177,528, which is significantly higher than the $52,428 median family income for their state of residence, as indicated on Debtor's Form 22C.  Debtor's average monthly income after payroll deductions is $5,688, and his non-filing spouse's average monthly income is $5,288.  Therefore, their combined average monthly income is $10,976.  Included in their payroll deductions are expenses for repayment of three 401(k) loans.

On Schedule A, Debtor indicates he and his wife purchased their home, which is located in Irmo, South Carolina near Lake Murray, in 2006 for $459,900.  He lists the current value of the property at $413,000.  On Schedule D, he states there are two mortgages on the property totaling $414,348.71.  Debtor indicates the monthly payment on the mortgages is $3,153.  Other secured claims listed on Schedule D include a $33,223.87 claim secured by a 2011 Chevrolet Camaro valued at $30,000; a $28,624.84 claim secured by a 2004 Four Winds 24 foot deck boat ("boat") valued at $27,500; a $8,455.87 claim secured by a 2010 Seadoo jet ski ("jet ski") valued at $7,500; and a $4,875.50 claim on a 2005 Chevrolet Silverado valued at $4,825.  At the hearing, Debtor testified he and his wife purchased the boat in March 2007 for approximately $39,000 and the jet ski in 2009 for approximately $12,000.  The Camaro was purchased at or near the time Debtor learned of the change in his job situation.  According to Schedule E, the Internal Revenue Service has a $14,800 unsecured priority claim for Debtor's 2009 income taxes.  On his amended Schedule F, Debtor lists $71,850.79 in unsecured nonpriority claims,

2

consisting mostly of credit card debt. At the hearing, Debtor indicated that most of the purchases made with these credit cards were for the benefit of his family, not just himself.

Debtor lists monthly expenditures totaling $9,563 on Schedule J, resulting in a monthly net income for him and his spouse of $1,413. The expenditures listed include $2,920 in other expenditures. In part, these other monthly expenditures consist of a $375 boat payment, a $241 jet ski payment, a $200 storage fee for the boat,[1] and $600 rent for a room in Charleston. In his brief, Debtor asserts he saves money by renting this room in which he stays during the workweek because, when he began working in Charleston, he discovered that his fuel costs for commuting were approximately $1,000 a month, as it is 265 miles roundtrip from his home in Irmo to his work site in Charleston.

Debtor proposes a Chapter 13 plan under which his plan payments will be $1410 per month for a period of 60 months. Under the plan, $631 of the $1410 plan payment will go to the lien holder on the Chevrolet Camaro. Debtor proposes to surrender his interest in the 2005 Chevrolet Silverado to the lien holder on that vehicle. Debtor also proposes to surrender his interest in the boat and jet ski to the lien holders on those items. However, these two watercraft will not be surrendered as his non-filing spouse will remain current on the payments outside of the plan. The Trustee estimates that under the plan, Debtor will pay 26% of his unsecured debt.

The Chapter 13 Trustee objects to the plan, asserting that Debtor is not applying all of his projected disposable income to pay unsecured creditors in violation of 11 U.S.C. § 1325(b)(1) and that Debtor has not filed his plan or petition in good faith. More specifically, the bases of the Trustee's objection are: (1) Debtor, through the artifice of surrendering his interest in luxury items and having his non-filing spouse pay for them outside the plan, is not applying all of his

---

[1] Debtor testified at the hearing that it is necessary to store the boat somewhere else because it is too large to fit in Debtor's driveway.

disposable income to the plan payment; and (2) Debtor and his non-filing spouse are using their incomes to maintain a luxurious lifestyle at the expense of Debtor's unsecured creditors. Primarily, the Trustee objects to Debtor's plan to surrender his interests in the boat and jet ski but not the items themselves. Rather, his non-filing spouse will remain current on the payments outside the plan. The Trustee asserts that while Debtor is surrendering legal ownership of the property, the plan is an attempt to retain possession of the items through his non-filing spouse. Additionally, the Trustee advances that if the $816 being used to pay for the watercraft were added to the plan payment, Debtor would pay almost 80% of his unsecured debt.

Under 11 U.S.C. § 1325(b)(1), a court may not approve a Chapter 13 plan to which the Trustee has objected, unless "the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or . . . the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan." Section 1325(b)(2) describes how projected disposable income is calculated by defining income and allowed expenses. *In re Barnes*, 378 B.R. 774, 778 (Bankr. D.S.C. 2007). A debtor's sources of income consist of the following two categories: (1) "monthly income from all sources that the debtor receives (or in a joint case the debtor and debtor's spouse receive) without regard to whether such income is taxable income" and (2) "any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent) . . . ." 11 U.S.C. § 101(10A); *see also Barnes*, 378 B.R. at 778. "The burden of proof for an objection under 11 U.S.C. § 1325(b) is a shifting burden where the Trustee . . . is initially required to

4

produce satisfactory evidence that Debtor is not devoting [his] 'projected disposable income' to [his] Plan and, once this burden is met, the burden shifts to Debtor to demonstrate, by a preponderance of the evidence, compliance with 11 U.S.C. § 1325(b)." *Barnes*, 378 B.R. at 777.

The Trustee also asserts Debtor has not filed his plan or petition in good faith. Title 11, United States Code, Section 1325(a) provides that a plan must be "proposed in good faith and not by any means forbidden by law" and that "the action of the debtor in filing the petition [must be] in good faith." See 11 U.S.C. §§ 1325(a)(3), (7). "While no precise definition can be sculpted to fit the term 'good faith' for every Chapter 13 case," the Fourth Circuit Court of Appeals has stated that "[b]roadly speaking, the basic inquiry [is] whether or not under the circumstances of the case there has been an abuse of the provisions, purpose, or spirit of [the Chapter] in the proposal or plan." *Deans v. O'Donnell*, 692 F.2d 968, 972 (4th Cir. 1982) (third alteration in original) (citation omitted). Although the Fourth Circuit rejected the importation of a *per se* rule of substantial repayment to unsecured creditors into the good faith requirement, it has stated substantial repayment is one factor to be considered among others in determining if a plan has been proposed in good faith. *Id.* Other factors might include, depending on the particular case, "the debtor's financial situation, the period of time over which creditors will be paid, the debtor's employment history and prospects, the nature and amount of unsecured claims, the debtor's past bankruptcy filings, the debtor's honesty in representing the facts of the case, the nature of the debtor's pre-petition conduct that gave rise to the debts, whether the debts would be dischargeable in a Chapter 7 proceeding, and any other unusual or exceptional problems the debtor faces." *In re Solomon*, 67 F.3d 1128, 1134 (4th Cir. 1995) (citing *Neufeld v. Freeman*, 794 F.2d 149, 152 (4th Cir. 1986)); *see also Deans*, 692 F.2d at 972. These factors are not exhaustive and are not intended to be a "check-list," as a "court's discretion in making the good

faith determination is necessarily a broad one" and should be based on an examination of the totality of the circumstances on a case by case basis. *Deans*, 692 F.2d at 972. Debtor has "the burden of proving by a preponderance of the evidence that [his] plan meets the confirmation requirements of § 1325(a), including the good faith requirement of § 1325(a)(3)." *In re Bridges*, 326 B.R. 345, 349 (Bankr. D.S.C. 2005).

As the Trustee notes in her objection, if this Chapter 13 petition was a joint filing by Debtor and his spouse, the Martellinis most likely would not be able to keep the watercraft at the expense of their unsecured creditors. *See In re Loper*, 367 B.R. 660, 664-65 (Bankr. D. Colo. 2007) ("A plan should not be confirmed 'whenever debtors include in their budgets expenditures for luxury items, or excessive expenditures for non-luxury items.'" (quoting *In re McDaniel*, 126 B.R. 782, 784 (Bankr. D. Minn. 1991)); *In re Kasun*, 186 B.R. 62, 64 (Bankr. E.D. Va. 1995) (denying confirmation of Chapter 13 plan where debtors proposed to pay in excess of $600 per month toward their retention of a luxury boat while paying only 34.9% of their unsecured debt); *In re Hedges*, 68 B.R. 18, 20-21 (Bankr. E.D. Va. 1986) ("The purposes of § 1325(b) would be ill-served if the Court were to allow the debtor . . . to retain possession of purely recreational property not reasonably necessary for maintenance or support of the debtor or his dependents while his general unsecured creditors are to receive, over an extended period of time, less than half of the total amount of their claims."); *In re Cordes*, 147 B.R. 498, 505 (Bankr. D. Minn. 1992) (denying confirmation of Chapter 13 plan that included payments to the lien holder on a recreational boat notwithstanding "debtors' lack of malice, guile or avarice").

The present case is different because Debtor plans to surrender only his interest in the watercraft, but his family will keep the watercraft as a result of the non-filing spouse paying for them outside the plan. However, this is not the first time a court has faced such a set of

circumstances.   In *In re McNichols*, the Bankruptcy Court for the Northern District of Illinois,

when confronted with a situation similar to that presented here, reasoned that "[t]he family is a

functioning unit, of which the Debtor is an integral and important member, and the totality of the

family's income and expenses is appropriately considered in calculating both the disposable

income of the Debtor for purposes of § 1325(b)(2) as well as the good faith requirement of §

1325(a)(3)."   *In re McNichols*, 249 B.R. 160, 170 (Bankr. N.D. Ill. 2000) (*"McNichols I"*).   In

denying confirmation of the proposed plan, the court concluded:

> While a nondebtor spouse can understandably be expected to pay for certain
> family expenses in amounts greater than the Debtor, there is no compelling logic,
> as the Debtor argues, to have some reasonably necessary expenses paid 50/50
> while others are borne by the spouse at a much higher percentage, especially the
> nonessential luxury items, such as vacation home, timeshare, housekeeper,
> hairdresser and manicure expenses.   True enough, some of those items are
> purportedly to be paid for by the spouse from his income, but the Debtor has the
> direct or indirect benefit and enjoyment of same. It is not appropriate for the
> Debtor to "cherry pick" the family expense budget and have luxury items paid for
> through allocation to the nondebtor spouse so that the net effect is to maintain a
> luxurious lifestyle, but only pay a small dividend to unsecured creditors . . . .

*Id.* at 170.   Moreover, while the *McNichols* court stated it would favor an approach where the

debtor and non-filing spouse "proportionally bear reasonable and necessary family expenses to

maintain the family in the same relative ratio as their respective net incomes," it also indicated it

"would disallow all unnecessary luxury items from the family budget in determining the

Debtor's disposable income."   *Id.* at 172.   In sum, the court found it "simply inappropriate and

unfair to the unsecured creditors to allow luxury items to be paid for through the expedient ploy

of budgetary allocation to pay for same from the spouse's net income when, in fact, the Debtor

directly or indirectly benefits therefrom."   *Id*; *see also In re McNichols*, 254 B.R. 422, 430-31

(Bankr. N.D. Ill. 2000) (*"McNichols II"*) (finding that debtor had not committed all of her

7

disposable income to fund a third amended plan and that the plan did not meet the good faith requirement and dismissing the case).

In *In re Nahat*, the United States Bankruptcy Court for the Northern District of Texas overruled the trustee's objections to a Chapter 13 plan where the non-filing spouse dedicated the balance of her income to the plan after paying debts she personally incurred.  *In re Nahat*, 278 B.R. 108, 111 (Bankr. N.D. Tex. 2002).  However, in doing so, the court noted it was "mindful that situations may exist requiring a different result."  *Id.* at 117.  The court reasoned that the non-filing spouse's income was dedicated to paying creditors and that "[t]o the extent there [was] a surplus after payment of obligations incurred by her, it [was] devoted to necessities and satisfaction of the terms of the Plan.  Were that surplus being used to underwrite luxuries to be enjoyed by the Debtor and Mrs. Nahat, while the Debtor used chapter 13 for lien stripping, extensions of indebtedness and discharge of unsecured claims, there might exist grounds for dismissal of the case or denial of confirmation on the basis that the chapter 13 filing was in bad faith."  *Id*.  In the present case, the non-filing spouse is using her income to pay for luxury items from which Debtor will derive enjoyment even if he does not personally use them.  Moreover, the money owed for the boat and jet ski are debts that were incurred not just by the non-filing spouse but by Debtor as well.[2]

---

[2] In the Chapter 7 context, courts have confronted a similar issue in connection with arguments that the granting of relief to a debtor would amount to an abuse of the bankruptcy system.  *See In re Travis*, 353 B.R. 520, 530 (Bankr. E.D. Mich. 2006) ("Debtor has not abused the Code by failing to require his non-filing spouse to fund repayment of his obligations.  The non-filing spouse is choosing to use her income to pay her unsecured creditors in full, she is not using her income to fund an extravagant lifestyle for her and the Debtor.  If the Debtor's non-filing spouse's extra income was funding a vacation home or an expensive car for the Debtor, the Court could reach a different conclusion.  In this case every dime of the non-filing spouse's income is committed to legitimate expenses of her own or household expenses of her and her dependents."); *In re Staub*, 256 B.R. 567, 571 (Bankr. M.D. Pa. 2000) ("I cannot simply ignore, as Debtor would have me do, the fact that he is married to a spouse whose disposable income is

The Court has carefully considered Debtor's arguments as to why his plan is proposed in good faith. While Debtor is correct that there is no *per se* rule of substantial repayment before a plan can be considered filed in good faith, *Deans*, 692 F.2d at 972, the Court cannot overlook the fact that Debtor's family will keep two expensive recreational items while less than 30% of his unsecured debt is paid. In addition, the Court does not entirely agree with his statement that "his current financial situation arose unexpectedly and not by his own actions or financial mismanagement." While the Court acknowledges that Debtor's bankruptcy was precipitated by a change in his employment, Debtor testified that he knew his assignment in Orangeburg was temporary. Furthermore, Debtor has incurred debt to such an extent that he is not able remain current on his obligations even though his and his wife's combined annual gross income is still $177,528. These obligations include over $70,000 in unsecured debt, primarily consisting of credit card debt, and debts for a $39,000 boat and a $12,000 jet ski. The jet ski and possibly the boat were purchased at a time when Debtor was working in a position that paid more than his current position but that was also temporary. Debtor indicates he attempted to refinance his home mortgage in order to reduce his monthly payments but was unable to do so because of a lack of equity. While the Court commends Debtor for his efforts at refinancing his mortgage, the Court cannot ignore the fact that he and his wife purchased the home for $459,900 and that he might be better able to afford his obligations if they had purchased a more moderately-priced home. Finally, Debtor states his wife works in a position that involves fiduciary responsibilities and that she does not want to be involved in the bankruptcy or surrender the watercraft because such an adverse credit event could result in her losing her job. However, Debtor has not

---

so great that it could pay off the entirety of his unsecured debt in a matter of months."). *But see In re Baldino*, 369 B.R. 858, 862 (Bankr. M.D. Pa. 2007) (finding that "Congress chose to exclude that portion of the non-filing spouse's income devoted to personal pursuits or expenses from current monthly income").

9

presented evidence to support his assertion that if his wife surrendered the watercraft, it would result in her employment being terminated.  Furthermore, in the end, what is at issue is not the non-filing spouse's discomfort with her family's financial situation and with the available alternatives for dealing with it but rather Debtor's good faith.

Debtor also asserts that courts favor distributing household expenses pro rata between a Chapter 13 debtor and a non-filing spouse in order to ensure that "the bankruptcy estate has not assumed responsibility for a disproportionate share of the reasonable household expenses."  *In re Herrmann*, C/A No. 10-06523 (Bankr. D.S.C. Feb. 9, 2011) (Waites, C.J.).  Debtor asserts that after paying her share of the household expenses, his wife has $1,638.08 remaining, which more than covers the $816 needed for the monthly payments on the watercraft and the storage for the boat.  The facts in *In re Herrmann* are distinguishable from those here as that case involved a married couple who filed jointly and did not allocate any of the husband's social security income towards the payment of creditors or living expenses.  In addition, one court has stated that while it favored a pro rata approach, it would also "disallow all unnecessary luxury items from the family budget in determining the Debtor's disposable income."  *McNichols I*, 249 B.R. at 172.

It is not the role of this Court to instruct a non-filing spouse how to spend her income.  Rather, it is this Court's role to evaluate whether the plan before it has been proposed in good faith, and Debtor has the burden of proof on this issue.  *In re Bridges*, 326 B.R. 345, 349 (Bankr. D.S.C. 2005).  This burden has not been met.  After careful consideration, the Court finds that Debtor's plan is in violation of 11 U.S.C. § 1325(a)(3) as it has not been proposed in good faith.  More specifically, the Court finds the plan is not proposed in good faith because Debtor's family, through the guise of Debtor ceding his interest to his wife, proposes to continue ownership of and payments on a $39,000 boat and $12,000 jet ski while at the same time Debtor pays less than

30% of his unsecured debt, much of which Debtor testified was incurred making purchases for the family's benefit.  This combined with the purchase of the 2011 Camaro rather than a more moderately priced vehicle so near to the time of Debtor's uncertainty with his job situation tips the balance against Debtor.  It is noteworthy that a significant portion of Debtor's monthly plan payment will be consumed to pay for the recently acquired vehicle.  "Debtors do not have an entitlement, at the expense of their creditors, to maintain their prepetition lifestyles and status in society, especially when their prior lifestyles '. . . were characterized by luxury, excessive consumption of nonessentials, or inordinately high expenditures for purchases of necessities.'" *In re Daniel*, 260 B.R. 763, 769 (Bankr. E.D. Va. 2001) (quoting *In re Bottelberghe*, 253 B.R. 256, 263 (Bankr. D. Minn. 2000)) (omission in original).  Debtor asserts it was the change in his employment that resulted in this bankruptcy.  However, the decision by Debtor and his spouse to purchase items such as the boat, the jet ski, an expensive home, and a new vehicle and to accumulate the significant unsecured debt demonstrated in Debtor's filings no doubt contributed to their current financial situation.[3]  The Court finds it "simply inappropriate and unfair to the unsecured creditors to allow luxury items to be paid for through the expedient ploy of budgetary allocation to pay for same from the spouse's net income when, in fact, the Debtor directly or indirectly benefits" from those luxuries.  *McNichols I*, 249 B.R. at 172.  Even if Debtor no longer uses the watercraft, as he asserts, his spouse and child presumably still do, and he most likely derives enjoyment from their use of these items.  This enjoyment is coming at the expense of

---

[3] Additionally, the Court questions whether Debtor's renting a room in Charleston for $600 actually saves him money.  He states he began renting the room after discovering his fuel expenses if he commuted from Irmo to Charleston every day would be approximately $1,000 per month.  At the hearing, he testified this number was based on spending about $50 for fuel per round trip.  At the hearing, he also testified that he still commutes to Charleston at least two or three times a week for various reasons.  Assuming it is two times per week, his fuel costs would be $100 a week.  Multiply $100 by four weeks in a month and add the $600 for rent, and it equals $1,000.

Debtor's unsecured creditors. This Court cannot ignore the fact that Debtor seeks to discharge a significant amount of unsecured debt, much of which Debtor testified was incurred for the benefit of the family, while, at the same time, his wife attempts to keep ownership of a $39,000 boat and $12,000 jet ski they purchased jointly. As noted by the Trustee, if the $816 paid a month to keep these items was added to the plan payment, Debtor would pay almost 80% of the unsecured debt he owes, which again was incurred mostly for the family's benefit.[4] While the Court stops short of announcing a *per se* rule against a non-filing spouse assuming complete ownership of and continuing to make payments on items purchased by a Chapter 13 debtor and a non-filing spouse, it does find that the plan here falls short of the good faith requirement set forth in Section 1325(a). On the other hand, the Trustee's insistence on a *per se* rule that only a 100% payment plan avoids scrutiny of the expenditures of the non-filing spouse is likewise inconsistent with the law in the Fourth Circuit, which requires a thorough facts and circumstances analysis as opposed to a bright line test.

For the reasons set forth herein, it is hereby ORDERED that the Trustee's objection to confirmation is sustained and confirmation of Debtor's July 25, 2012 plan is denied. Debtors are given ten (10) days from the date of this Order within which to propose and file an amended plan. If no amended plan is filed within ten (10) days, this case may be dismissed without further notice or hearing.

AND IT IS SO ORDERED.

---

[4] At the hearing, Debtor indicated the reason he has not sold the boat or made more of an effort to do so is that he cannot sell it for more than what he and his wife owe on it. As for the jet ski, Debtor indicated they were close to the breakeven point where they might be able to sell it for at least what is owed on it. Even assuming the boat cannot be feasibly sold, Debtor does not provide evidence of efforts to at least sell the jet ski.